Mr. Seward, you may proceed. Thank you, Your Honor. May it please the Court, I'm Scott Seward on behalf of the United States. If I may, Chief Judge Thomas, I'm going to aim to save five minutes for rebuttal. In this case, the District Court issued a preliminary injunction barring the government from applying to tens of thousands of people a critical asylum rule. That rule, by its terms, applies to an alien who enters, attempts to enter, or arrives in the United States on or after July 16, 2019. The District Court held, however, that the rule, by its terms, does not apply to a class of aliens who will enter after July 16, 2019. That was the only merits basis the District Court gave for its preliminary injunction. But it was not the, it was not actually the argument of the plaintiffs. And it certainly wasn't the only argument of the plaintiffs. It was not the only argument of the plaintiffs. It wasn't even the argument of the plaintiffs, actually. It was, it was not, they were really arguing about metering, Your Honor. They did, I believe, around pages five to six of their injunction motion, mention it. But it was, it was something the District Court largely moved on, on, on, with the thrust of her own. It was not the focus of the briefing by any, by any stretch. But that, that, in doing so, that was certainly wrong. The Court should stay the injunction pending appeal, particularly because the equities so strongly favor the United States and the, and the public. And the Supreme Court has already allowed this rule to go into full effect nationwide. Starting with the, the merits, Your Honor, I, I've already identified. Well, I'm sorry. What rule has the United, has the, the, the, first of all, the Supreme Court has allowed the, I don't know what we're calling it, asylum. Transit rule. Transit rule. You're calling it the transit rule. They're calling it the asylum ban. We, I've called either one. We called the transit ban. The transit ban. Okay. The transit ban, they've allowed that to go into effect, but they haven't addressed this subgroup at all. They haven't addressed the metering, metering problem or this subgroup, number one. Number two, the asylum, the transit rule is currently before a panel of this Court on the merits. That's correct, Your Honor. On the merits, in general, on the merits of the preliminary injunction, I'm not sure. It's, it's from the preliminary injunction in that, in that case, Your Honor. Your Honor is, is correct that the Supreme Court addressed specifically the nationwide injunction of the rule. However, as we, and, and we have indicated, there is a lot of tension between the stay, the stay order here and the, the injunction in this case, particularly on the harm and in, in quality, like, like harms, and in fact, operationally. Well, no. I mean, the, their, the plaintiff's position is that these people did arrive in, before that time. Let, let's leave out for the moment the district court's gloss on this. They arrived before that time. They were told that they had to wait, and as a consequence of waiting, now a new rule is applied to them, which is going to make it impossible for them to get asylum, and also impossible, in most instances, for them to comply with the rule. That, that's their argument. So their harm is, is quite different. It's not that the rule is being applied to them as a rule. It's that the rule is being applied to them unfairly because, and, and in a way that they can't comply with it. I agree that that's, that's essentially their argument, Your Honor. I would disagree that it, that it really makes, makes any meaningful difference to the equitable balance here. Really? I mean, this remains, asylum is a discretionary benefit. Folks who arrive but never enter into the United States have no particular entitlement to any specific asylum eligibility rules or procedures. They don't have rights standing outside the United States like that. Really? Oh, okay. And, and, and the rule here denies them a discretionary benefit, does not squarely strip them of asylum. It, it lays out the process for complying with the rule. And also, Your Honor, one point that's, that's very critical here is that the, the tens of thousands or so class members who are at issue are, are really folks who fall in the heart of this rule. Folks who have spent a significant amount of time in a third country, they're, they're claiming that they really need asylum, that it's, that it's a matter of urgency and importance to do so. But instead of seeking protection at, at the first available opportunity, seeking it in at least one country they transit, they wait and bide their time and ultimately want to make their, to their preferred destination. That's sort of at the merits of the rule itself. I mean, let's assume the rule applies. The only question is, does it apply to this subclass, and that's the merits argument. And then for us, what's, what's the irreparable harm if we allow these, this to go forward? So would you walk me through, let's assume for the sake of argument, that the preliminary injunction would apply. So walk me through what happens. They're, they, so they've got, they're metered. In other words. Didn't the rule apply, Your Honor? I'm sorry, you said the preliminary injunction applied. I, I want to make sure I have that. As to, as to this class. Okay. In other words, preliminary injunction against the government saying, you know, we've, these, they've got their ticket. Let's assume it's a, a number in line. Walk me through what happens if, in fact, we allow this to go forward in the few months before this gets heard on the merits. The government will be continue, be, be able to assess each person as they arrive to see if they, they fall within the rule's terms, or an exception. If somebody is ineligible for asylum, they won't be able to seek asylum. They could seek withholding, convention against torture protection, that sort of thing, and, and pursue, pursue protection that way. And the rule would just continue functioning nationwide as it was, as it was before, before this injunction was in effect, Your Honor. And. But, for, for someone in this class, let's say they've got, let's, leaving aside the term metering, let's assume they've got a number, they're standing in line, so their number's called, and with a, with the injunction, we say, yeah, your, your asylum petition, withholding, cap, whatever, can be processed. How long does that take now? The asylum, so you're saying they, they pass through credible, they make the required showing, putting the rule aside. Leaving aside the rule. Yeah. I, I, I can't really pinpoint a good, sometimes those take months, or many months, and it, it can take a while, Your Honor. Right. Same, I believe, with the withholding prospect. So, so what's, what's the irreparable harm of allowing this subclass to continue to go through the system, and if, and you prevail, you say you didn't, you didn't apply for asylum in a third country, that's, that's a denial. But, I mean, what's, what's the harm of allowing them to go through the system, which is gonna take months, much longer than it's gonna take to get these cases heard? Well, the first step. What's the irreparable harm to the government? I mean, aside from that, that 26,000 or so folks that we'd have to unwind, Your Honor. Yeah. The, the big point is the one that we, we, we've, we explained at some length in our, in our briefing, and that is the system-wide harm on the administration of this rule. One of the benefits of, of this rule is it's, it's quite easily administrable. You can find out relatively expeditiously whether somebody falls within its scope. Now we have this problem where we need to find out whether somebody's a class member. There are a large number of class members who are under a preliminary injunction. We have the risks that come with noncompliance of that, and, but at the same time, we really want to apply this rule because it is very, very important to, to the, the, the executive branch's policy agenda. So we're not going to just, we don't want to just cavalierly or willy-nilly not apply the rule to, to people, but we need to comply, if, if the injunction is not stayed, we would need to comply with the injunction, and we need to take this rigorous approach to find out is somebody a class member or if they're not. It's not on the face of things, as we, as our declarations explain, obvious or clear that, you know, this precise group of folks are class members, and that's, you know, we deal with them and done with it. It's a process. But in the meanwhile, I mean, the other part of the irreparable harm, in the meanwhile, it's perfectly possible that you're going to get an order from this court that the whole transit rule isn't valid anyway. So it's all the more reason, well, I mean, that issue is still there. But there's a stay of, there's a stay of. I know there's a stay at the moment, but that goes into the irreparable harm, doesn't it, which is that it's a contingent, it's contingent to begin with whether this provision is going to be applied. At all. I don't think so. To anybody. Your Honor, I think that that doesn't fully honor the effect of the Supreme Court stay. I mean, the Supreme Court stayed that injunction through, not just through disposition of this appeal, but through the filing of any government petition for certiorari. So the court envisioned that this rule would be in effect for some period of many months. As Your Honor knows, that takes some time. So whatever this panel rules, the rule will be, or the injunction will be stayed and the government will be able to continue applying it. And the injunction here prevents the government from applying it to a large number of folks and also systematically undermines the government's ability to apply it and compounds the very burden. I don't quite understand that argument, and maybe you can help me with that. So the number's called, the applicant goes to the border, they have a credible fear assessment, you find out at that point whether they're a member of the class or not, and they're referred beyond that or not. So I don't understand the, it's no different from what's happening at the border right now in any case, right? The only additional burden is they have to ask the question, you know, are you a class member or not? That's not right, Your Honor. Look, help me out. Sure, Your Honor. So this is the Caudel-Murillo Declaration. This is the updated version that I'm referring to. This is Appendix particularly 225 to 228. It gets at the burdens of identifying class members on a prospective basis. And one of the key points it makes is it's not so easy as having somebody who's on a list come up and just asking a single question. It's adding meaningful time to each interview, the need to ask a number of questions. We want to make sure, we quite reasonably want to make sure that somebody is actually a class member and that they haven't been coached. That just takes time. It can increase the burdens. It makes, there are problems of just rescheduling interviews, and those kind of burdens reduce the number of credible fear interviews we're able to complete. It ripples across the system, diverts resources, and it's that kind of systemic harm that it undermines the very aims that this rule is trying to get at, which is alleviating the burdens on the asylum system through an efficient and sensible mechanism. So that's a system-wide harm. The Caudel-Murillo Declaration is very good on that, Your Honor. The Searcy-Owen Declaration also hits a number of points in the problems of reinterviewing a large number of people. I'd also add that I, just to get to one issue with, I think, the premise of your question, Your Honor, is that these— I mean, we see a lot of asylum cases, obviously, here, and we've followed it through. We know the systemic problems, so I mean, I'm just trying to pigeonhole this thing into the broader context. I think that declaration walks things from an experience well-informed— But it's all assumptions and projections. It's not based on any actual experience, even though there's been experience. No, it's based on the expert assessment of somebody who has had some operation with how the rule is going to work and how, on the ground, people are going to have to deal with this, Your Honor. But it starts from the premise that the government has no way of knowing at all whether any of these people were within the group, but in fact, there is a large record that demonstrates that there were systems set up and numbers and lists created, and I understand that the United States government didn't create the lists, but it's using the lists, and it seems to have—be asking the Mexican government to essentially send people pursuant to those lists. The lists may not be sacrosanct, and they certainly could be inaccurate, but they're certainly a pretty good starting point, so there isn't a zero when you start. And the premise of these declarations is that you're starting with no way of idea whether anybody is on that list. That's not right, Your Honor. The plaintiffs' own declarations say that the wait lists are themselves imperfect, subject to fraud and abuse. I just said they were imperfect, but they're not nonexistent. But— And the declarations begin from the premise that there's absolutely zero known about these people. I don't think that's right, Your Honor. I think the declarations more begin from the premise that we want to make sure that we are correctly identifying class members. These lists are not reliable. We cannot vouch for them, and we need to, therefore, undertake a proper investigation because this is an important rule. I'd like to change the subject. Yes, Your Honor. Let's assume that—we haven't really discussed the merits of the district court's ruling, but as we said at the outset, it wasn't what the plaintiffs asked her to rule on. It seems to me that in terms of the—what they asked her to rule on was the merits of the metering practice with regard to this sub—as applied to this subgroup. And the question is, do we look at the record ourselves with regard to that question, even though the district court—or could we—as to whether the—they have a likelihood of success on their challenge to the metering practice with regard to this subgroup? No, Your Honor, and here's why. It's—in this context where the district court didn't rule on this heavily contested issue, it would be inappropriate and imprudent to do that. All right, but my first question is, is it heavily contested, i.e., did the government put in—what is the record that the government has contested the information that was put in the record? There's—I would say there's ongoing discovery in the case, Your Honor, and the case is proceeding that way. So that's still developing. But the government has put in declaration—declaration material—other material saying, look, here's why we do metering. We have legitimate reasons. Metering is categorically lawful. We do it to manage resource constraints, to deal with throughput, to deal with the tremendous multifold mission challenges that we as a government face on the southern border. My friends do make sweeping statements about the legality of metering. Those are—those have not been decided. We disagree with their view on metering. That is not resolved. Well, what has been decided is this legal question as to whether the arriving language in the statute applies to this group. The district court had decided that in the motion that was dismissed and used it as the premise for her preliminary injunction as to the language of the transit rule, right? And so to that degree, we have a legal ruling which we could rule on as to its probability of success on the merits. I mean, there is a legal ruling there. For the reasons we've said, Your Honor, regardless of that motion to dismiss reasoning, it doesn't help here because the rule simply applies regardless of what the court may think of that motion. Which rule? I'm sorry. Sorry. The transit rule itself. That rule by its terms applies to this group. But what I'm saying is that with regard to whether the metering practice is valid or not, that legal ruling is the core. Now, she did not then go on to look at the—I suppose the additional issues are, well, is this actually happening and what are the reasons why it's happening, are those justifiable reasons despite what she says is what the statute means, and maybe all this is a pretext discussion. And the question is do those facts matter, and if they do, can we look at the record ourselves with regard to likelihood of success on the merits? The court should not look at the factual questions right here, Your Honor. They have not been resolved by the district court. And here's the— Well, they're not going to be resolved in a preliminary injunction. They're going to be resolved in a likelihood of success basis. Your Honor, here's the point I'd emphasize. This is a class-wide injunction. The district court certified a class based on an erroneous view of what the legal question was that she needed to decide. The problem with metering is that even the district judge—and this is at Appendix Page 81, Page 1212 of the Motion to Dismiss Opinion—even the district court acknowledges, as Your Honor just suggested, that there may be valid reasons for metering. That means that the district court judge cannot decide on a class-wide basis that metering is categorically lawful. The government's view— Well, she might be able to. She just—or we might be able to, if we looked at the record, on a likelihood of success basis. I mean, we're not going to decide it— Your Honor— —because that's not what's before us. Your Honor, that is a—that runs into other barriers with class-wide injunctive relief in this context. And it's—it would be, I think, very inappropriate for this Court to reach out and resolve that issue that, by the district court's own lights, is a disputed—is a disputed factual issue that could turn on on particular reasons at particular times. It would be— Well, it's all declarations. I mean, no one—there's no—no one's suggesting there's going to be a—a evidentiary hearing on—on the preliminary injunction. I mean, Your Honor, you don't even have a state briefing in any meaningful way on this metering issue. But we—well, we could get it, but we do have—well, we do, actually. And that's what surprised me, is that both parties quickly morphed into the merits of the metering issue, and I now understand why, which is—well, that's what was actually in the district court. Your Honor, I mean, it was pages and pages of—of dispute in the—or of argument in the district court briefing. This is something that's been evolving over the course of time now. The government maintains that metering is just—is lawful and that, you know, it's—it's not, you know, lawful, period. But again, that's still going on in the district court. The district court did not rule on it. And not—given the sole merits basis, the district court— But she was asked to rule on it. She didn't rule on it, and I—you know, here we are with this—with this sweeping injunction, and with—where—and one reason she may not have ruled on it, Your Honor, is that it is such a difficult issue to rule on in—in a way that would have allowed this injunction. We—we maintain that she could not have issued a class-wide injunction had she tried to do so on metering. The flaws would have been manifest. How is this going to be—how is the metering question going to be resolved in the court below? In other words, is the district court going to issue some kind of summary judgment? Is there going to be a summary judgment proceeding on the legality of metering now that we have all this evidence? Or is there actually first going to be a motion for class certification that then—are these happening concurrently? Maybe you can educate us on how the district court is—is intending to resolve both of those issues. Sure, Your Honor. I—I don't have the full picture at the moment, but I can—I can try to get that. Class certification briefing on the main case itself is—is due in, I believe, several weeks. In fact, discovery is on—is continuing, depositions and the like, collecting it just on, you know, all—all of the metering issues and other issues in—in the case. I'll—I'll try to get some of the other deadline. But it's—it's a—I see my— Do you have a discovery deadline? We do. I'll—I'll—I'll get that. I'll—I'll try to get that. It's a—it's in the docket. We can look it up, so. Very good. We'll—we'll give you some time for rebuttal. Thank you, Your Honor.  Good morning, Your Honors, and may it please the Court, I'm Ori Lev from Mayor Brown. On behalf of plaintiffs' appellees, I have with me at counsel table Bahar Azmi from the Center for Constitutional Rights, Melissa Crow from the Southern Poverty Law Center, and Nora Phillips from Plaintiff Elatro Lado, Inc. With the Court's indulgence, I'm going to first address the government's failure to harm to the class members, and then talk about the All Writs Act, and my co-counsel, with whom I'm splitting my time, will be addressing the statutory interpretation questions of the Immigration and Nationality Act that underlie the District Court's motion to dismiss opinion, as well as its interpretation of the asylum ban. Okay. You may proceed. Thank you. What the Court has before it is a question of whether to upend a narrow prohibitory injunction that the District Court put in place to address what it described as a quintessentially inequitable situation. And that is a situation that happened because the class members, in this case, did exactly what they were supposed to do, and what the government asked them to do. First, they went to a port of entry to seek asylum, as opposed to crossing between the ports. The government told them, wait, you can come back when we can take you. And they waited. And then, in a classic bait and switch, the government changed the rules on them and said, oh, sorry, now you're ineligible for asylum. There's no, and the District Court points this out, or says this explicitly in her order, there's no dispute that this rule couldn't apply to these plaintiffs. The only question is, does it apply to them on the face of the rule? And it clearly does. And so, I'm not sure what purchase the Catch-22 argument could have in light of that. I'm sorry, Your Honor, I disagree with the premise of your question. As Judge Berzon noted, we didn't base our preliminary injunction motion on this interpretation of what the rule means, although we think the District Court was correct in its interpretation of the rule. But even if you think that the rule, on its face, applies to class members, the injunction here was an appropriate exercise of the District Court's authority. Well, how? I mean, well, I guess I have two questions. One, what is your best argument about why the District Court is correct in its reading of the rule? Or do you not care to make that argument? I think it's a hard argument. And the second is, if we don't, you do need a likelihood of success on some basis. Or we can talk about the Orr-Ritz Act, which is actually a very interesting question after a very recent opinion of this Court, which suggests that maybe you don't need any merits in an Orr-Ritz Act situation. But it's mysterious. But anyway, the—but I don't know which one you're arguing. So first, are you supporting, or can you tell us your best argument for supporting what the District Court actually did? And if you don't go into that, how do we proceed? Sure. Your Honor, we're arguing on three fronts. Setting aside—I mean, I do want to speak to irreparable harm, because I think the government has not met its burden there. But in terms of the merits basis for the injunction, there are three grounds on which this Court could affirm the District Court's ruling. The Orr-Ritz Act. That's something that the plaintiffs argued to the District Court, and it's something  that—but it's incorrect that the interpretation of the asylum ban was the sole merits basis for the District Court's order. So the Orr-Ritz Act is number one. Number two is interpretation of the asylum ban on its terms. And my co-counsel will address that, because that turns on the statutory interpretation of the INA. And that is something that the plaintiffs didn't argue, but the District Court did rule upon. And the third ground—and, Your Honor, you were referring to this earlier—is our likelihood of success on the merits of our underlying metering claims, which we did brief to the District Court, is in the record before this Court. And there are numerous opinions of this Court that state that you can affirm the issuance of the preliminary injunction based on any evidence in the record, even if it's not something the District Court relied on. Are you asking us to rule on the merits of the metering? Because that issue has been being litigated in District Court now for, I think, three years. It would seem very aggressive to, all of a sudden, affirm the District Court on that basis when these proceedings are very much ongoing. Well, Your Honor, preliminary injunctions always occur when proceedings are ongoing. We're not asking you to rule on the legality of the metering, but we do believe that we're asking you to affirm—not today, today we're just asking you to deny the stay because the government hasn't met its burden. But on the merits briefing, we will be asking you to affirm the District Court's issuance of the preliminary injunction. And among the basis to do that is the likelihood of plaintiff's success in the metering claims and the fact that this very relief that was issued as part of the preliminary injunction would be appropriate relief at the end of this case. And this goes both to your question, Your Honor, about what about the terms of the rule, and to your question, Your Honor, about the All-Writs Act. The All-Writs Act is, in the Supreme Court's words, right, it gives courts the express authority to issue such temporary injunctions as may be necessary to protect the court's jurisdiction. That is precisely what the District Court did. It's precisely what the District Court said it did. Are you aware of the Mecocow v. Hawaii case that came out in the last week or two? I am not, Your Honor, but— Well, it discusses in an interesting way and in an interesting context whether the All-Writs Act, J, includes the merits and says not necessarily, but it's very mysterious because if the All-Writs Act preserves the jurisdiction of the court, so does a preliminary injunction. So what's the overlap between them? Well, Your Honor, I don't think that for the court to issue an All-Writs Act, it needs to make a finding of a likelihood of success. Well, I know that, but then isn't that a complete end-run around the standards for preliminary injunctions? Well, I think it provides the court an alternative basis in unique circumstances to be able to issue an injunction to preserve its jurisdiction. And I think it's narrower in that respect, right? Preliminary injunctions are not limited to preserving the court's jurisdiction to resolve the issue. But there's nothing — there's nothing about the court's jurisdiction that would require that. The metering practices are what this case is about. There are people who are challenging those metering practices. Some of those are subject to the third-country transit rule. Others are not. The court could rule on the metering practices and go forward with that ruling, but to use the All-Writs Act to somehow freeze the state of immigration law as of July 2019, I'm not aware of any basis that would allow a court to do that. Your Honor, I respectfully disagree. The All-Writs Act — if the asylum ban is applied to the class members. Every class member who has the asylum ban applied to him or her and is removed from the United States will forever lose their right to have their claim heard on the basis of the law as it existed when they arrived in the United States. But so that — If I — by that logic, what the district court would need to do before it's even reached the legality of the metering, which may well be lawful if she has yet to tell us her views on that, you would have to freeze the state of immigration law as of July 2019 in all Well, I think if the government tried to change the rules again with respect to individuals who arrived in the United States, and as my colleague will point out, where the government's statutory duties to inspect them for asylum were triggered, that is correct. But we're talking about a narrow class of people here, right? These are people who are told to wait, and if — without this injunction, they will lose their rights. The court, most importantly for the All-Writs Act purposes, will lose its ability to provide any effective remedy for that illegal conduct. That's a jurisdictional point, Your Honor. That goes to — right, you need to have a harm that's remediable in court in order to have jurisdiction. That's precisely — So then what is the difference between that standard and the irreparable harm standard? Is it just an irreparable harm that — because irreparable harm suggests that it's not reparable. And yet it is only one of four factors in the preliminary injunction context. I mean, this is really a query because I — it's possible we should have some briefing on this case because it suggests this is all an open question, but I don't really understand how the pieces fit together. Your Honor, I think that's a fair question, and I don't have a great answer for you. But I think in this case and in this circumstance, I do have an answer for you, and that is the All-Writs Act and the likelihood of success arguments that we made below and that are in the record both support affirming the injunction ultimately. And today, today, clearly the government has not met its burden of demonstrating its strong showing of a likelihood that it will succeed in the appeal because it hasn't addressed either of those things. It has not addressed the All-Writs Act in its papers, and it has not addressed the underlying likelihood of plaintiff success in the merits. You didn't — And it has not. You didn't obtain — your clients didn't obtain this injunction based on any likelihood of success on what this case is actually about, which is the metering. What you obtained the injunction — on the basis for granting the injunction was just didn't apply to your clients because they had been metered. That was the success that you were found to have. There's been no determination on your likelihood of success on the underlying case. I agree with that, Your Honor, but those arguments and the record evidence supporting it are in the record, and this Court has repeatedly held that it can affirm a preliminary injunction based on arguments and evidence in the record that the district court did not rule upon. I'm conscious of my colleague's time. If I may just a moment speak to irreparable harm and the government's failure, again, to meet its heavy burden here of seeking a stay. The government moved for a stay in this Court and first submitted any evidence of irreparable harm three weeks after the injunction was issued. So it has been in place for that entire time period. One would expect, in that circumstance, that the government's evidence would include some evidence of actual harm that occurred. And Judge Berzon, as you indicated, the declarations are instead all assumptions and projections. There is not a single fact about the actual impact the injunction had during those three weeks. There's no statement about how it impacted the processing of claims during that time period. There's not a single example of a credible fear interview or an asylum hearing lasting substantially longer. There is not any data from a single court of entry or a single asylum court about any statistics about the alleged system-wide delays that this would cause. And the only conclusion can be that that's because those harms did not come to pass in those three weeks. And there's no reason to believe they're going to come to pass in the short period that this Court's going to consider the preliminary injunction, which will be fully briefed in the next six weeks. It seems to me that — Has the district court — where does the stay motion in the district court stand? I know she had a status hearing set for next week or — I believe the status hearing, Your Honor, is probably before the magistrate judge in discovery matters. The motion for a stay that was filed in the district court and the district court had not ruled upon before the government moved in this court is technically still pending in the district court. I don't know, but I'm guessing that the district court is not going to act on it until this court acts on the motion before it. And it's obviously aware that there's a pending motion for a stay before this court as well. Judge Brouse had a question. Yes, the question I have for you is, it does seem to me that when we have a world in which the Supreme Court has told us that the third country transit rule can be enforced and we're now trying to carve out of that some — I think the estimate is 26,000 people to try to figure out who they are, when they were metered. That — it just sounds very difficult to me that that would be reasonably possible to do. Your Honor, with respect, the Supreme Court's stay of the injunction regarding the asylum ban is not controlling here in any way, shape, or form, right? It involved different legal claims, right? Legal claims that went to the validity of the asylum ban, whereas our injunction doesn't turn on that. We believe the injunction is appropriate even if this court or the Supreme Court ultimately uphold the asylum ban. No, I understand that, but I'm talking about the difficulty of administration at the border because what I think the government is concerned about is trying to weed out who is a member of the class and who is not, trying to comply with the district court's injunction but at the same time to be able to execute on the third country transit rule, which the Supreme Court has said they may do while those proceedings are at least now ongoing. Sure, they're concerned about that, but they have a burden that they haven't met of demonstrating that the injunction is causing them irreparable harm. Right. I think Judge Bress's question is more practical in terms of how this would be administered at the border with class members if the preliminary injunction stays in effect. Sure. And, Your Honor, I would point out that the government has failed to take the most basic steps to minimize the burdens of that implementation, and those would include two things. Two things just off the bat. One is obtaining the very wait list that they rely upon to determine which noncitizens they are going to allow to enter the U.S. to seek asylum, as Judge Berzon indicated. That's at least a starting point. It might not be the ending point. And second, providing any guidance to the public about what kind of evidence they're looking for, what they're expecting to have happen at these hearings, because if you read the declarations, the alleged parade of horribles that's going to happen is that everyone's going to ask for continuances to go get this evidence. There's not a word from the government, and plaintiffs have tried to engage with Defense Counsel about implementation of the injunction, about how this is going to go about. But it shouldn't be difficult, right? An individual asylum hearing lasts one to three hours. That's information from the government's declarations. You can ask the asylum seeker a question about when he or she arrived at the border and whether they were metered. You can seek a declaration from an asylum seeker about those facts, and you can cross-check the asylum seeker's names against the very wait list you're relying upon to allow individuals to enter the country. That to me does not sound like such an irreparable harm that's going to cause the asylum system to completely shut down, certainly not during the pendency of the merits briefing of this appeal. So I think that's the practical answer, is the whole asylum process is built to understand, to discover facts about the individual seeking asylum. This isn't such a complicated or challenging or difficult fact to ascertain, and is a marginal addition to what's already happening. The only record before the court about the actual implementation and how this has actually been implemented was provided by the plaintiffs, and it's the excerpt of record. It's pages 21 to 37, and it is a copy of an actual credible fear interview that was conducted. And you can see there that there are three questions that are asked of the individual in that case to ascertain their class membership. The long document, like 10 pages, there's three questions that go to this point. That, Your Honor, is the practical implementation of the injunction, and that again is the only record before the court about how the injunction is being implemented. That answers the question for you. Yeah. Thank you. Thank you, counsel. Thank you, Your Honor. We'll hear from your colleague. Thank you. Good morning, Your Honors, and may it please the Court. I'm Melissa Crowe from the Southern Poverty Law Center for plaintiffs at Paliz in this matter. As Mr. Lev noted, with respect to the likelihood of success on the merits factor, this Court could affirm the P.I. based on one or more of three independent grounds. I'm going to explain why the government has failed to make the requisite strong showing that it's likely to succeed on the merits of its P.I. appeal based on Sections 1225 and 1158 of the INA. As Your Honors know, the primary basis for the district court's decision granting the P.I. was that the asylum ban, by its terms, does not apply to class members who as a matter of law arrived in the United States before it was implemented. The district court relied on the reasoning of its earlier decision denying the government's to dismiss, and that decision found, based on the plain language of the INA, that individuals who attempted to seek asylum at ports of entry were, quote, arriving in the U.S. at the time they were metered, and thus entitled to be inspected and processed under 8 U.S.C. 1225 and to apply for asylum under Section 1158. The district court's reasoning was based on normal canons of statutory construction. I guess the question is, why would this be relevant? Because the district court did issue that ruling. At some point, that ruling will presumably be reviewed, but we can assume that that ruling is correct. It still doesn't justify what happened here, which was an incorrect reading of the third country transit rule, which does, by its terms, apply to persons who are now attempting to seek asylum, regardless of whether they've done so at a prior time. Your Honor, the government makes what we consider a specious argument about the fact that the plaintiffs essentially are arriving twice. Well, they may well be arriving twice, so the question—go ahead. Why is it specious? So, at page 4 of its reply brief, the government argues that it cannot—or the government actually concedes that it cannot return asylum seekers awaiting processing inside the United States to Mexico and then render them subject to the asylum ban. Yes, and that's presumably because it's illegal for them to return them to Mexico. And so the question here is whether your argument with regard to the regulation itself depends on the illegality of not having processed them the first time. In other words, which we will get to, right? I mean, that's the merits question, the illegality of not having processed them the first time. And assuming, as Judge Bress is doing, that there is a likelihood of success on the legal question that the district court ruled on with regard to the meaning of arriving, how does that—if one doesn't get to the legality of the entire metering process here—help your argument with regard to the analogy? In other words, if the metering was legal, why are they not going to arrive again? Well, Your Honor, our argument is that based on the district court's interpretation, our class members are in precisely the same situation as individuals inside the U.S. awaiting processing because the government's mandatory obligations under Section 1225 were triggered at the time they were first— So that is a fact—a merits—a request for a merits decision on the metering that says the facts don't matter, right? It doesn't matter why they were doing this or whether they had any justification or whether it was pretext. You just—I mean, it's a viable—I mean, it's not an implausible argument, but I'm just saying that we would then have to accept the fact that if these people were there, they had to process them regardless of capacity and regardless of pretext and so on, and therefore it was illegal not to process them. In other words, we still have to get in some way at least to the likelihood of success on that argument. Is that right? The government—our argument is that the government was obligated to inspect and process them, and that the government shirked its obligations by metering the class members in this case. And therefore, it was invalid not to do it, and therefore that's at least the issue that the district court didn't decide. The legality of metering, you mean? Even the likelihood of success on the legality of metering. Correct, but as my co-counsel noted, we did raise that argument— I understand. All I'm saying is that you don't avoid that problem by reading—by your analogy to the people who would be taken out of the United States and then sent back again. Your Honor, I— Pretty good analogy, but it only works if they were in Mexico illegally to begin with. Your Honor, I'm not—with respect, I would ask you to clarify the problem that you are referencing. The problem is that you cannot, without in some respect getting to the likelihood of it, decide at this case, because whether there is—whether this is, as you began saying, some kind of a bait-and-switch or whatever, depends on the legality of that original metering. Yes, Your Honor, but it doesn't necessarily depend on the statutory interpretation that the district court gave us, both in its— interpretation and go somewhere else, because that statutory interpretation by itself isn't going to do anything. Well, it does bear on the legality of metering under— Which statutory interpretation are we talking about? The arriving-in interpretation. Oh, yes, that does, but not the interpretation of the regulation. We can't just—can—could we decide this case just on her interpretation of the regulation without regard to whether the metering to begin with has a likelihood of success, of succeeding on its infallibility? Well, I believe the relevant question is whether the individuals were arriving in the United States at the time they were metered, and she's answered that question affirmatively. I mean, just to maybe say it a different way, the district court here, we have two—we have two issues. We've got a third-country transit rule, the district court's not purporting to rule on the merits of that. We've got, on the other hand, a metering practice. The district court is, at some point, going to rule on that but has yet to do so. Neither of those have been resolved yet, and so on what basis would your clients be entitled to a preliminary injunction when neither of these rules has yet been enjoined? Your Honor, all you have to look at is—based on the district court's decision—is the language of the asylum ban itself. The government's interpretation would essentially render superfluous the effective date limitation in the asylum ban by applying it to asylum seekers who arrived in the U.S. before the effective date and did not leave by their own volition. It would also, as I've indicated, negate their statutory rights and subject them to brand new rules. I'm really confused. As I understand the government's argument, it's that, okay, let's assume, as the district court said, these people arrived in the United States when they first presented themselves on the bridge and were turned back. But they were turned back, and let's also assume that there was no—unless you're going to have to decide the question of whether that was a valid turning back or not. But if you're not going to decide that, then you have to assume that it was okay to turn them back. If you assume that, then why aren't they simply going to have to arrive again? Now, I don't—all that leads to is that the language—and what I understood the district court did was that, i.e., it said, I'm not going to—I'm not deciding whether it was—I've told you what I think about arriving, but I haven't told you whether I think there's a likelihood of success on the question of whether their being sent back, given all the facts and so on, was valid or not. I'm not telling you that. I'm just saying that if you look at this statute and at the regulation, regardless of whether they were legally turned back or not, it doesn't apply to them. Are you defending that proposition? I am defending the district court's reasoning, and I think the kernel of your question goes to the fact that arriving in is different from metering itself. So you don't have to rule on the legality of metering. You only have to decide whether these individuals were arriving in at the time that they were  Okay, let's say they were, but if they were legally turned back at that point, then why isn't the government right that they're going to arrive again and that they don't have any equities with regard to the fact that they were—I mean, I think the equities are extremely strong if they were illegally turned back as to why they should be able to go back to where they were at that point, but if they were legally turned back, why do they get to go—to be treated as if they were in the country at the time when they were legally turned back? I think that would enable the government to benefit from its obstructive conduct, which is— But if it's legal obstructive conduct, if they were allowed to do it, then why can't they benefit by it? I mean, I don't see how you avoid getting to, in some way, to the merits of whether the turning back was legal or not, unless you want to go to your all-restraint argument, which I'd like to hear. Well, I'll turn back to my colleague for that. Well, before you leave, I thought your argument was essentially—and maybe I misinterpreted it—that if you credit them as having arrived when they first appeared, then the legal fiction is that they're in an equivalent situation as if they were in the United States, and it doesn't matter whether they were turned back legally or illegally, they preserved their place in line as part of the class. Am I misinterpreting your argument? Yes, Your Honor. So, your argument in the district court's logic is, they arrived, they get put in this class, and it doesn't matter if they arrive again or not, or whether they're legally or illegally turned back, they've arrived for the purpose of the statute. So then that rises or falls on the statutory interpretation of the INA. That's absolutely correct, Your Honor. That's how I interpreted your argument. Yes. And the government would say, no, we legally turned them back and they're arriving a court that plainly applies them. Is that where we are in this case? Yes. I will note, if I may, that there are other grounds that we argued in our preliminary injunction briefing and also in our stay briefing. As Your Honors have noted, the district court did not rule on those grounds, and the government did not address those grounds in their stay briefing. That's true. And, of course, we can, at least our case law says, we can rely on any justification in the record. But it's pretty tough, I think, at this stage in this particular case to rule on the legality or illegality of metering based on the record, wouldn't you say? I don't think so, Your Honor. Our claim under APA 7061 is essentially based on the same reasoning that the district court used in its motion to dismiss. And our 7062 claim is that the defendant's metering policy exceeds their statutory authority, which is a question of law. We've argued in the alternative that either defendants have no such statutory authority or, alternatively, that they violated the APA by turning back asylum seekers based on pretext. And that is an issue that requires delving more deeply into the facts. But those facts are all in the record before you. All right. Thank you, Counsel. Thank you. I'll put five minutes up. Thank you, Your Honor. Just a few points. In this panel's administrative stay order, the court recognized that allowing the preliminary injunction to proceed could cause complications at the border. Our declarations and our briefing here do bear that out and explain exactly why that is so. Administrative stay is an administrative stay, and this is a message to both sides. It's the best we can do in a big hurry in terms of what's the status quo and how fast can we get to the—I mean, what we've developed now is this three-level, you know, we're deciding the administrative stay, we're deciding the stay, and then we're deciding the preliminary injunction. No, it's four levels. And then we're deciding the case. And there is enormous overlap as to all of those things, and it seems to me best to have the merits, including of the preliminary injunction, including the irreparable harm, you know, at a point that we can actually absorb it. So I don't think we should put any—much stock in what was said there. Other than that this was what was going on on the ground, and therefore we weren't going to disturb it. I'm making the observation, Your Honor, that our declarations and the points in our briefing does bear out that observation made in that order. Can you address the All Writs Act point? Because I did not read the district court's opinion to be suggesting that the All Writs Act was some alternative basis for the merits aspect of the ruling. I read the opinion to basically—to be essentially in response to the argument that the district court was somehow prohibited from issuing any kind of ruling. In other words, it was sort of more of a jurisdictional type analysis than a merits one. You have that exactly right, Judge Bress. The court, in Part 2 of its opinion, titled jurisdiction that began at page 8 of the order and continued through page 21. The court did proceed through multiple statutory arguments for why, in the government's view, it lacked authority to reach various issues. At the end of that jurisdictional section, Part C, it got to the All Writs Act at pages 19 to 21, and it literally begins with alternatively and goes into why, in the court's view, even if these statutory bars did prevent it from reaching things, the All Writs Act would allow it to do so. Its merits section, the preliminary injunction analysis, shows up later at pages 29 to the end of the opinion, and the merits piece, very short as it is, is itself from pages 30 to 32. So that's — you have that right, Judge Bress. I would add here, and I think this is a point hit by a couple of Your Honors that I want to emphasize, is that the merits basis the district court gave here was only about the rule scope. That is definitely wrong, given the state posture of this case. Well, it's not necessarily wrong. I mean, again, they arrived in — if one buys — you think it's wrong because you think that she was wrong about the fact that they arrived the first time. But suppose they did arrive the first time. I think our position is that the rule doesn't apply regardless of what the decision is on that issue, Your Honor. Well, but then the question is whether for that arrival, even if there were a second arrival, there was still a first arrival. And as to that arrival, whether they were legally told to wait, they didn't un-arrive. And why aren't they entitled to a determination as of that arrival of their availability or their eligibility for asylum? But, Your Honor, I think that gets into the point that Your Honor was noting earlier. Well, right. I think it's a — I think it's a question. Does it matter? Right. Whether that was — in other words, if they were turned back, did that make them un-arrive or did it mean that they were just told, okay, you've arrived, but — because she's already decided that. But maybe the government has the right to make you wait in Mexico until we go further. My response would simply be, Judge Berzon, that however that goes, the alien class here will still be entering, attempting to enter, or arriving in after the rule's effective date, and therefore would be squarely covered by the rule. Given the nature of the meeting — But only if you wash out the first arrival. If you just say the first arrival didn't happen. It doesn't matter, Your Honor. Somebody can arrive in May 2019 and then August 2019, and the rule still applies to them. Nothing in the rule makes a prior arrival or entry relevant to the rule's application. Well, except the phrase, attempts to enter. I mean, so the rule by its — I mean, if you would agree that if they haven't tried to seek entry in the United States — I mean, let's say they go to the border, as this class does, prior to July 16th, they attempt to enter. Maybe they — the legal fiction is they did enter. Why does the rule apply to that entry if they're entitled to keep the fictional place in line? There's not support for that view of kind of an ongoing arrival or entry, Your Honor. Plus, somebody's still entering the United States — You know, there's no law on it either way, as far as I can tell. Is that right? I mean, Your Honor, we think that the Immigration and Nationality Act is pretty clear on that, coupled with Supreme Court case law and extraterritorial application, that people standing outside of the United States are not within — Yeah, but now you are arguing about whether she has — there's a likelihood of success on her arrival interpretation. What I'm trying to do, Judge Barzani, is just emphasize that these are hard issues that cannot form the basis for denying a stay of this erroneous class-wide injunction, given the merits basis. Well, it has to have a likelihood of success. And we've shown that. We've shown that, Your Honor. The district court — as Judge Bressan, I believe, noted, the district court did not find a likelihood of success on the — But it did preside earlier, this arrival question, and incorporate it into her current. So on that question, on that legal question, you need to show a likelihood of success on merits. We do not, Your Honor. Oh, really? Why? Your Honor, that was a motion to dismiss where the plaintiff's allegations were accepted as true. Yes, but she incorporated it into this preliminary injunction. And — but whether incorporated or not, the rule still would not apply, Your Honor, for the reasons that I've given. And we would sit on those reasons. And the fact that — But those are different reasons. I — let me — But the arriving-in issue is really a threshold issue in terms of, are these the types of plaintiffs who could challenge the metering practices under the INA? The district court has denied your motions to dismiss and said yes. There's now a whole second question of, are the metering practices nonetheless lawful under the INA? That is a completely different question that hasn't been resolved yet, and there is no Nobody's — that issue, we don't know — we haven't yet seen the outcome of that. No one's even touched that yet. That's right, Judge Bresson. And to circle back to your question on my opening part of the argument, there — as I understand it, there's not a discovery deadline, and I don't believe we have a summary judgment deadline yet. Discovery is continuing. We're still awaiting class certification motions in the next — in the coming days or weeks on these issues. If you are not going — how can you succeed on your argument if you don't undertake to demonstrate a likelihood of success on the question of whether the arrival — interpretation of arrival was correct? And you, at one point, said, well, you weren't contesting that, and then you said, but they're outside the territory and they didn't arrive, so you seem to be standing on both feet. Which foot are you standing on at this point? I didn't — I don't believe — I didn't mean to say we don't contest that, Your Honor. I was saying that it's not relevant to the rules applicate — the Court doesn't need to reach that. We have, however, contested the district court's motion to dismiss reasoning in our State Briefing here. We say, look, you don't need to reach that, but it's wrong for all of these reasons because the district court's process of arriving theory is just legally flawed and unsound. Again, this Court — I want to make sure that I understand the — and I've read the briefing, but to understand the legal issue, the narrow legal issue of leaving site metering is that their position is they fall outside the rule because they attempted to enter or arrived, and they say whether it's relation back, whether it's preserve your place in line, the rule doesn't apply to us. Your position is they've got to arrive again, and the rule applies. Is that kind of where we are on that? Our position is that people who never — who — Your position is, first, they didn't arrive. Right. They didn't arrive, and the statutes didn't apply to them. But they certainly attempted to enter. I'm not sure about that, Your Honor. An attempt is — I don't — I'll put it — the parameters of attempting to enter have not been flushed out thoroughly in this case, so I want to be careful there. What I would say is that the class of individuals we're talking about here are folks who are outside of the United States and would need to enter or arrive in the United States after the rules. And your — their position is we don't — the fact that we're — that the clients are in Mexico doesn't matter because they have preserved their spot in line as if they were into the United States. Your position is it does matter. They didn't arrive and fall back. They didn't arrive again, and the rule applies to them. Is that kind of where we are? I think that's part of it, Your Honor. And I would emphasize, though, that folks who don't cross the threshold of the borders are very differently situated for folks who are in our borders. That's the Supreme Court's decision in Sale and other authorities. I understand. I'm struggling with the language attempted to enter because they clearly — if they're a legitimate member of the class, they did attempt to enter. And so, facially, the rule would not apply to them unless — unless the fact that they had to remain in Mexico overrides that. I'm not — I don't think so, Your Honor, because, I mean, one attempt to enter — under the rule, it doesn't matter if you previously attempted to enter before the rule was — took effect. If after the rule was in effect, you attempted or did whatever. I understand your point. Yeah. Okay. Very good. Thank you, Your Honor. Very good. Thank you all for your arguments and your briefs. It's been very helpful to the Court.  Thank you.
judges: Thomas, Berzon, Bress